# 2007 DTA 73

**TRIBUNAL DE APELACIONES
REGIÓN JUDICIAL DE SAN JUAN
PANEL I**

RAMÓN DÍAZ ROBLES; CARMEN GARCÍA VÁZQUEZ; TOMÁS A. SAN FELIZ Y JEAN M. PARNELL; JOSÉ R. MARCHAND MÁRQUEZ Y PATRICIA ANN PARNELL; LUIS VÉLEZ GAVILÁN; JUAN B. AQUINO LÓPEZ; CRISTINA SOLER MUÑIZ; ROBERTO SHARON SANTANA Y LESLIE Y. FLORES RODRÍGUEZ, MARIANO SANTINI ROMÁN; GLORIA E. GARCÍA VÁZQUEZ; BLANCA I. RIVERA BERRÍOS
Querellantes-Recurrentes

v.

HERA DEVELOPMENT, S.E.; SUMMERTIME DEVELOPERS, CORP.; BUILD TECH, INC.; UNIQUE REALTY, INC.; BUILDERS GROUP & DEVELOPERS GROUP; PLAYA BAHÍA INC.
Querellados-Recurridos

---------------------------------------------------

ROBERTO VIGOREAUX LORENZANA Y MARY ANN CORTES CAMACHO
Querellantes-Recurrentes

v.

HERA DEVELOPMENT, S.E.; SUMMERTIME DEVELOPERS, CORP.; BUILD TECH, INC.; UNIQUE REALTY, INC.; BUILDERS GROUP & DEVELOPERS GROUP; PLAYA BAHÍA INC.
Querellados-Recurridos

Núms. Cons. KLRA-05-00865 / KLRA-05-00957

48

San Juan, Puerto Rico, a 22 de mayo de 2007

Panel integrado por su Presidenta, la Juez Rodríguez de Oronoz,
el Juez López Feliciano y la Juez García García

López Feliciano, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Habiendo sido consolidados los recursos de epígrafe, a continuación procedemos a disponer de los mismos.

En ambos recursos, las partes que recurren solicitan la revocación de la resolución dictada por el Departamento de Asuntos del Consumidor, en adelante el DACO, el 31 de octubre de 2005 y notificada a las partes el 2 de noviembre siguiente.

Mediante dicha resolución, el DACO desestimó las reclamaciones de los querellantes; resolvió que procedía la cancelación de ciertos contratos de opción; y ordenó a Summertime a devolver los $2,000 que los querellantes dieron en concepto de depósito al recibir dichos contratos.

Con el beneficio de la comparecencia de las partes, y del estudio del derecho aplicable, estamos en posición de resolver, lo que a continuación hacemos.

## I

La recurrida Summertime Developers, Corp., en adelante *"Summertime"*, adquirió un predio de terreno de la compañía Hera Development, S.E., en adelante *"Hera"*, donde construiría el proyecto de viviendas *"Casa de Playa"*. El referido proyecto constaría de 192 unidades de vivienda tipo *"walk up"*.

Los recurrentes firmaron cada uno idénticos contratos uniformes de opción. Inicialmente, los firmaron con la recurrida Hera. Posteriormente firmaron el mismo contrato con Summertime. Todos dieron un depósito de $2,000.

El 1 de mayo de 2001, Summertime presentó su solicitud de licencia de urbanizador y/o constructor ante el DACO. El 6 de junio de 2001, DACO expidió la licencia. La entidad a cargo de la venta del proyecto lo era la recurrida Unique Realty, Inc.

Así las cosas, Summertime no citó ni notificó a los querellantes la firma del contrato de compraventa dentro del tiempo estipulado en el contrato de opción. El 9 de octubre de 2003, Summertime suscribió un contrato de opción de compraventa del proyecto en construcción con la recurrida Builders Group & Development Corp. La cantidad de la opción fue de $250,000. Como parte del contrato de compraventa, las partes acordaron cancelar los contratos uniformes de opción convenidos con los recurrentes.

Conforme a lo pactado en el contrato de opción de compraventa, Summertime procedió a enviarles cartas a los recurrentes donde les informaba de la cancelación del proyecto y de sus contratos de opción. Justificó su decisión en eventos impredecibles y fuera de su control, los cuales ocasionaron un incremento en los costos de construcción del proyecto.

Entre los eventos impredecibles y fuera de su control mencionó: (a) la radicación de un procedimiento de quiebra del contratista del proyecto; (b) la intención del Departamento de la Vivienda de expropiar un predio de terreno del proyecto que había sido destinado y promocionado como estacionamiento de visitantes y área de recreación; (c) tres procedimientos de desahucio que tuvo que radicar contra unos precaristas en la propiedad; y (d) una orden de paralización emitida por la Administración de Reglamentos y Permisos a raíz de una querella de los residentes del área protestando la construcción del muro que circundaba el proyecto.

Conforme a las razones expuestas en su comunicación, Summertime informó a los recurrentes que daba por cancelada la ejecución del proyecto y que procedería con el reembolso de los fondos recibidos por concepto de depósito para la compra de las unidades. Les informó que recibirían el dinero en o antes de los 30 días siguientes.

En contestación a la carta recibida, los recurrentes Tomás A. San Feliz y su esposa Jean M. Parnell; Ramón Díaz Robles y Blanca I. Rivera Berríos; y Roberto Vigoreaux y Mary Ann Cortés, le enviaron a Summertime una comunicación certificada con acuse de recibo oponiéndose a la cancelación. Solicitaron una reunión y manifestaron su interés en ejercer su derecho de opción. De igual manera hicieron los querellantes Carmen J. García Vázquez, José Marchand Vázquez, Juan B. Aquino y Roberto Sharon. Éstos se opusieron mediante comunicación telefónica.

Los depósitos dados por los recurrentes nunca fueron devueltos por Summertime, por lo que éstos presentaron querellas ante el DACO. Solicitaron como remedio el cumplimiento específico de los contratos uniformes de opción firmados con Summertime. El 16 de febrero de 2005, el DACO consolidó las querellas presentadas para dilucidar las mismas en la Oficina Regional de San Juan. El 20 de febrero de 2005,

Summertime contestó la querella.

El 16 de marzo de 2005, los recurrentes, Carmen García Vázquez, José Marchand Márquez y Juan B. Aquino, presentaron moción enmendando sus querellas, a los fines de incluir en la querella a los recurridos Builders Group & Developers, Corp. y Playa Bahía, Inc. Solicitaron además una orden de cese y desista para tratar de impedir que las recurridas vendieran los apartamentos opcionados por éstos y así evitar que su reclamación se tornara académica.

El 29 de marzo de 2005, los recurrentes Tomás San Feliz y su esposa Jean M. Parnell y Ramón Díaz Robles presentaron querella enmendada para incluir a una nueva parte querellante, Blanca I. Rivera Berríos; y a otras partes querelladas, Builders Group & Developers y Playa Bahía. Además se unieron a la solicitud de cese y desista previamente presentada por los recurrentes.

El 30 de marzo de 2005, Summertime presentó una *"Moción en oposición a solicitud de remedios"*, en réplica a la moción presentada 16 de marzo de 2005 por los recurrentes. El 25 de abril de 2005, las recurridas Build Tech, Builders Group y Playa Bahía, presentaron una solicitud de desestimación de las querellas enmendadas y en oposición a la paralización solicitada, por alegadamente no tener participación en la venta del proyecto *"Casa de Playa"* y por ser un tercero adquirente. Alegaron, además, que los recurrentes consintieron a la cancelación de los contratos de opción y que ellos no habían intervenido dolosamente en la cancelación de los mismos.

Luego de varios trámites procesales de rigor, el DACO señaló la vista administrativa para adjudicar las querellas. Luego de celebrada la vista, el DACO emitió resolución. Desestimó la reclamación de los querellantes, toda vez que no se opusieron a la cancelación dentro del término de quince días dispuestos en el Reglamento para Regular las Distintas Actividades que se Llevan a Cabo en el Negocio de la Construcción de Viviendas Privadas en Puerto Rico, de 16 de septiembre de 1977, Reglamento Número 2268, en adelante, *"el Reglamento"*. Además resolvió que procedía la cancelación de los contratos de opción, toda vez que los sucesos mencionados en la carta de cancelación ocasionaron un incremento inesperado en los costos del proyecto que hicieron su realización imposible y que tales hechos no estaban bajo el control de Summertime. Ordenó a Summertime que les devolviera a los querellantes los $2,000 que cada uno dio por concepto de depósito del contrato de opción.

## II

Sostienen los recurrentes que erró el DACO al desestimar las querellas presentadas confirmando la cancelación de los contratos uniformes de opción, y ordenando la devolución del depósito a cada uno de los querellantes sin tomar en consideración la prueba presentada. En términos generales, indicó que tenían derecho al cumplimiento específico de sus contratos de opción y que los querellados incumplieron su obligación contractual.

## III

Antes de pasar a analizar los errores señalados, así como los planteamientos que hacen las partes sobre los mismos, procede que examinemos y expongamos la normativa de derecho aplicable al caso.

## A

La Ley Orgánica del DACO, Ley Núm. 5 de 23 de abril de 1973, según enmendada, 3 L.P.R.A. secs. 341 a 341w, confiere facultad al Secretario del DACO para resolver las quejas y querellas presentadas por los consumidores de bienes y servicios adquiridos o recibidos del sector privado de la economía, y conceder los remedios que sean procedentes conforme al derecho aplicable. Artículo 10-A de la Ley Núm. 5, *supra*, 3 L.P.R.A. sec. 341i-1.

## B

En la década de 1960, en Puerto Rico se aprobaron varias leyes con el propósito de proveer a los compradores de la entonces naciente industria de la construcción mecanismos que proveyeran a los consumidores un grado de protección más flexible e inmediato que lo que provee el Artículo 1483 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 4124.

A estos efectos, la Ley de la Oficina del Oficial de Construcción, Ley Núm. 130 de 13 de junio de 1967 (en adelante Ley del Oficial de la Construcción), 17 L.P.R.A. sec. 501 *et seq.*, y la Ley Orgánica del DACO, *supra*, le concedieron al Secretario de dicho departamento el poder y la facultad de regular el negocio de la construcción de viviendas privadas en Puerto Rico, para proveerle mayor protección a los compradores, garantizarles la debida atención a sus problemas y facilitarles el proceso de adjudicación de sus querellas. *Rivera v. A & C Development Corp.*, 144 D.P.R. 450 (1997).

Conforme la autoridad que la Ley del Oficial de Construcción le delegó, el DACO aprobó el Reglamento para Regular las distintas actividades que se llevan a cabo en el negocio de la construcción de viviendas privadas en Puerto Rico, de 16 de septiembre de 1977, Reglamento Número 2268.

La Sección 13 del Reglamento establece las siguientes causas de resolución del contrato de opción por parte del urbanizador y/o constructor:

*"(1) Cuando el COMPRADOR no haya depositado la cantidad de dinero requerida por el urbanizador, dentro del tiempo que se disponga en el contrato.*

*(2) Si el COMPRADOR le notifica por correo certificado al urbanizador y/o constructor que no tiene interés en seguir con los trámites de compra de la vivienda.*

*(3) Si el COMPRADOR ha tardado más de treinta (30) días desde la fecha en que se firmó el acuse de requerimiento hecho por correo certificado, para que compareciera a firmar el contrato de compraventa.*

*(4) Si por fuerza mayor o caso fortuito, no fuese posible cumplir con los términos del contrato."*

**(Subrayado nuestro.)**

La sección antes citada establece que el urbanizador deberá resolver el contrato conforme lo establece la Sección 17 del Reglamento. Ésta dispone que:

*"En caso de que un urbanizador y/o constructor o un COMPRADOR decida resolver el contrato de opción o de compraventa de acuerdo a las leyes y a este Reglamento, deberá notificar su decisión por correo certificado con acuse de recibo a la otra parte y expondrá la causa de dicha resolución. Si una parte hace la notificación personalmente, la otra firmará un recibo de dicha notificación. Si la parte notificada está de acuerdo con la resolución del contrato propuesta, el urbanizador y/o constructor procederá a devolver el depósito del COMPRADOR y podrá retener la suma autorizada en el contrato de acuerdo a este Reglamento dentro de los treinta (30) días siguientes de haber recibido dicha notificación en estricto cumplimiento al procedimiento establecido en la Sección 19 de este Reglamento sobre cuentas especiales de reserva o depósito (escrow).*

*De no estar de acuerdo la parte notificada con la resolución del contrato propuesta, deberá notificarlo según se provee en el párrafo anterior a la otra parte dentro de los quince (15) días siguientes de haber recibido la notificación de la decisión [...]."*

La Sección 19 del Reglamento, en lo pertinente al caso de autos, establece que todo urbanizador deberá depositar en una cuenta especial (*"escrow account"*) los dineros recibidos por concepto de precio del contrato de opción de compraventa. En el caso de la resolución de los contratos de opción, la Sección 19(2) establece el procedimiento a seguirse por parte del urbanizador y/o constructor. La misma dispone que:

*"El urbanizador y/o constructor enviará cada diez (10) días laborables o antes, por correo certificado, a la institución bancaria o de ahorros una notificación de los contratos de opción o de compraventa que hayan sido resueltos. La notificación indicará el nombre del COMPRADOR, su dirección, el nombre del proyecto, bloque y número de lote de la unidad que se está comprando, la cantidad del depósito, la cantidad a ser retenida por el urbanizador y/o constructor de acuerdo al contrato entre éste y el COMPRADOR y de acuerdo a este Reglamento: dicha notificación contendrá una orden de parte del urbanizador y/o constructor a la institución bancaria para que entregue al COMPRADOR la cantidad de dinero a ser devuelta a éste y un recibo firmado por el COMPRADOR de que se le ha entregado una carta por el urbanizador y/o constructor para que el banco le devuelva su parte del depósito. Tan pronto la institución bancaria y/o de ahorro reciba dicha notificación y los recibos correspondientes, procederá a acreditar en la cuenta que tenga dicho urbanizador y/o constructor en dicha institución las cantidades que le correspondan."*

## C

Tanto la Ley Núm. 130, *supra*, como el Reglamento, *supra*, claramente establecen, en su Artículo 17 y en la Sección 25, que nada de lo dispuesto en éstos *"se interpretará como una restricción o limitación al derecho que por el Código Civil de Puerto Rico, o por cualquier otra ley, se conceda en los casos de reclamaciones cubiertas por esta Ley"*.

En ese sentido, y en materia de contratos, el Código Civil establece que el contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio; así como que la validez y el cumplimiento de los contratos no pueden dejare al arbitrio de uno de los contratantes, y que éstos se perfeccionan por el mero consentimiento y desde entonces obligan, no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley. 31 L.P.R.A. secs. 3371, 3373 y 3375.

## D

De otra parte, sabido es que la revisión judicial de las decisiones administrativas tiene como fin primordial limitar la discreción de las agencias y asegurarse que éstas desempeñan sus funciones conforme a la Ley. *Torres Acosta v. Junta*, 161 D.P.R. ___ (2004), **2004 J.T.S. 71**; *Miranda v. C.E.E.*, 141 D.P.R. 775, 786 (1996). De ahí, que la revisión judicial debe limitarse a determinar si la agencia actuó arbitrariamente, ilegal o en forma tan irrazonable que la actuación constituye un abuso de discreción. *Torres Acosta v. Junta, supra; Franco v. Departamento de Educación*, 148 D.P.R. 703, 710 (1998).

Las conclusiones e interpretaciones de las agencias administrativas especializadas merecen gran consideración y respeto por los Tribunales. *Mun. de San Juan v. Plaza Las Américas*, 169 D.P.R. ___ (2006), **2006 J.T.S. 164**; *López v. Administración*, 168 D.P.R. ___ (2006), **2006 J.T.S. 146**; *Hernández v. Centro Unido*, 168 D.P.R. ___ (2006), **2006 J.T.S. 140**; *Comisionado de Seguros v. Puerto Rican Insurance Agency*, 168 D.P.R. ___ (2006), **2006 J.T.S. 142**; *Martínez v. Rosado*, 165 D.P.R. ___ (2005), **2005 J.T.S. 132**; *Polanco v. Cacique Motors*, 165 D.P.R. ___ (2005), **2005 J.T.S. 101**; *Otero v. Toyota*, 163 D.P.R. ___ (2005), **2005 J.T.S. 13**; *Rebollo Vda. de Liceaga v. Yiyi Motors*, 161 D.P.R. ___ (2004), **2004 J.T.S. 4**; *Pacheco Torres v. Estancias de Yauco*, 160 D.P.R. ___ (2003), **2003 J.T.S. 150**.

La revisión judicial de las determinaciones de hechos de las agencias administrativas está limitada por lo establecido en la sección 4.5 de la Ley de Procedimiento Administrativo Uniforme, Ley Núm. 170 de 12 de agosto de 1988, según enmendada, 3 L.P.R.A. sec. 2175. De acuerdo con esta disposición, las determinaciones

de hechos formuladas por las agencias administrativas serán sostenidas por los Tribunales, si están apoyadas por evidencia sustancial que obra en el expediente administrativo. No obstante, las conclusiones de derecho son revisables en todos sus aspectos. *Torres Acosta v. Junta, supra; O.E.G. v. Román,* 159 D.P.R. 401 (2003); *Miranda v. C.E.E., supra.*

La facultad de revisión judicial en estos casos ha de centrarse en tres aspectos principales: (1) si el remedio concedido fue apropiado; (2) si las determinaciones de hechos están razonablemente sostenidas por la prueba; y (3) si las conclusiones de derecho del organismo administrativo son correctas. Sec. 4.5 de la Ley Núm. 70, *supra; P.R.T.C. v. J. Reg. Tel. de P.R.,* 151 D.P.R. 269, 281 (2000); *Mun. de S.J. v. J.C.A.,* 149 D.P.R. 263, 279-280 (1999); *Misión Ind. P.R. v. J.P. y A.A.A.,* 142 D.P.R. 656, 674 (1997). El récord o expediente administrativo constituirá la base exclusiva para la acción de la agencia en un procedimiento adjicativo y para la revisión judicial ulterior. *Torres Acosta v. Junta, supra; Mun. de S.J. v. J.C.A., supra,* pág. 280.

Es norma reiterada que los tribunales apelativos no intervienen con las determinaciones de hechos formuladas por una agencia administrativa si las mismas están sostenidas por evidencia sustancial que surja del expediente administrativo. *Otero v. Toyota, supra; Rebollo Vda. de Liceaga v. Yiyi Motors, supra.*

El criterio bajo el cual un tribunal debe revisar las determinaciones de hechos e interpretaciones de una agencia administrativa es el criterio de razonabilidad. *Otero v. Toyota, supra; Fuertes y otros v. A.R.P.E.,* 134 D.P.R., 947, 953 (1993); *Murphy Bernabé v. Tribunal Superior,* 103 D.P.R. 692, 699 (1975). "*Ahora bien, en armonía con la finalidad perseguida, la revisión judicial de decisiones administrativas debe limitarse a determinar si la agencia actuó arbitraria o ilegalmente, o en forma tan irrazonable que su actuación constituye un abuso de discreción*". *Rebollo Vda. de Liceaga v. Yiyi Motors, supra.*

Así pues, al realizar su función revisora, el tribunal está compelido a considerar la especialización y experiencia a la agencia sobre las cuestiones que tuviera ante sí. Por tanto, en el descargo de su función deberá caracterizar entre asuntos de discernimiento estatutario o cuestiones de especialización administrativa. La deferencia reconocida no equivale a la renuncia de la función revisora del tribunal en instancias apropiadas y meritorias, como resulta ser cuando el organismo administrativo ha errado en la aplicación de la ley. *Rebollo Vda. de Liceaga v. Yiyi Motors, supra; Reyes Salcedo v. Policía de P.R.,* 143 D.P.R. 85, 94 (1987).

Por otro lado, "*al evaluar los casos es necesario distinguir entre cuestiones de interpretación estatutaria, en las que los tribunales son especialistas, y cuestiones propias para la discreción o pericia administrativa.*" *Rebollo Vda. de Liceaga v. Yiyi Motors, supra; Adorno Quiles v. Hernández,* 126 D.P.R. 191, 195 (1990).

Finalmente, sobre este tema, el foro judicial puede sustituir el criterio del organismo administrativo por el propio, únicamente en aquellas ocasiones que no encuentre una base racional que fundamente la actuación administrativa. "*No obstante, es axioma judicial que ante la prueba pericial y documental, el tribunal revisor se encuentra en igual posición que el foro recurrido y, por tanto, está facultado para apreciar la prueba apoyándose en su propio criterio.*" *Rebollo Vda, de Liceaga v. Yiyi Motors, supra; Dye Tex de P.R. v. Royal Ins. Co.,* 150 D.P.R. 658, 660 (2000).

## IV

Confrontemos el derecho antes expuesto con los eventos del presente caso.

En el presente caso, Summertime, conforme a la Sección 17 del Reglamento, *supra*, le notificó a los recurrentes, por correo certificado con acuse de recibo, sobre la cancelación del contrato de opción. Mediante la referida comunicación, les especificó las razones que le obligaron a ello. Siguiendo las disposiciones reglamentarias, Summertime también notificó al banco la cancelación de los contratos de opción por la imposibilidad de llevar a cabo el proyecto.

Los sucesos mencionados en la carta de cancelación ocasionaron un incremento inesperado en los costos del proyecto que hicieron su realización imposible. Tales hechos no estuvieron bajo el control de Summertime. De la exposición narrativa de la prueba se desprende que al momento de adquirir el inmueble en donde se desarrollaría el proyecto *"Casa de Playa"*, Summertime obtuvo declaraciones juradas de las personas que estaban ocupando la propiedad en concepto de precaristas. Éstos se comprometieron a desalojar en 30 días y que reconocían que no eran titulares. **Véase E.N.E., pág. 12.**

A pesar de las declaraciones juradas prestadas por los precaristas, éstos no quisieron desalojar la propiedad. No fue sino hasta el 14 de mayo de 2003, pasados más de dos años desde que Summertime adquirió el inmueble, que los ocupantes desalojaron la propiedad. Posteriormente, los antiguos ocupantes solicitaron y obtuvieron la paralización del proyecto por la Administración de Permisos y Reglamentos (ARPE). Esta agencia ordenó la detención del progreso de la obra con el propósito de verificar que todas las obras hechas hasta entonces se hubieren hecho conforme a los planos y especificaciones. En el 2004, ARPE revocó la orden de paralización. El efecto de esta ocupación y la posterior paralización de la obra fue postergar el progreso de la obra en más del doble del tiempo estimado. **Véase E.N.E., pág. 13-15.**

Por otra parte, y con el fin de llevar a cabo el desarrollo, Summertime obtuvo un préstamo interino de construcción con el Banktrust de Puerto Rico. El préstamo estaba garantizado con el inmueble sobre el cual se desarrollaría el proyecto. A esos fines se constituyó inicialmente una hipoteca sobre el inmueble por cinco millones quinientos mil dólares ($5,500,000). Esta hipoteca fue luego extendida en ochocientos mil dólares ($800,000) para un total de seis millones trescientos mil dólares ($6,300,000) de principal más intereses a razón del catorce (14%) por ciento de interés. **Véase E.N.E., págs. 12-13.**

Por recomendaciones de la presidenta del Banco y por el buen nombre de dicha empresa, Summertime contrató a Redondo Construction para la ejecución de la construcción de las unidades. Al momento de otorgarse el contrato de ejecución de obras no había indicio alguno de posibilidad de quiebra de dicha empresa. El tiempo contractual para que Redondo construyera las unidades era de 800 días calendarios, o sea, 2 años y 70 días.

El 19 de marzo de 2002, Redondo se declaró en quiebra. Inicialmente, Redondo asumió la continuación de la ejecución de la obra; sin embargo, la situación fiscal de la empresa le impedía obtener mano de obra y crédito para la compra de materiales en cantidad y calidad suficiente para mantener el progreso de la obra. Como consecuencia del incumplimiento de Redondo, el banco declaró a Summertime en *"default"*. A pesar de diversas gestiones realizadas por Summertime para tratar de continuar con la construcción del proyecto, se le hizo imposible. En ese momento, Summertime concluyó que no iba a poder continuar con el proyecto. Tomó esa decisión para tratar de evitar más pérdidas. **Véase E.N.E., pág. 14-16.**

Del expediente y de la exposición narrativa de la prueba claramente se desprende que Summertime cumplió con los requisitos tanto de la Ley Núm. 130, *supra*, como del Reglamento, *supra*, para la cancelación del contrato de opción. Una vez se dieron cuenta que por fuerza mayor, o sea razones ajenas a su voluntad, no les era posible cumplir con los términos del contrato, le enviaron las cartas de cancelación a los recurrentes. La notificación de cancelación se hizo conforme a derecho. Se les notificó por correo certificado con acuse de recibo y se les expusieron las razones para ello. Se solicitó al banco el reembolso de los fondos recibidos por concepto de depósito para la compra de la unidad. Se les indicó a los recurrentes que los fondos estarían disponibles en o antes de los próximos treinta días. Ninguno de los recurrentes se opuso a la cancelación dentro del término de quince días que dispone la Sección 17 del Reglamento, *supra*.

En virtud de lo anterior, resolvemos que actuó correctamente el DACO al desestimar las reclamaciones o querellas de los recurrentes. Procedía la cancelación de los contratos de opción, toda vez que los sucesos mencionados en la notificación ocasionaron un incremento en los costos del proyecto que hicieron su realización imposible y que tales hechos no estaban bajo el control de Summertime.

Los recurrentes no nos han demostrado que existe otra prueba en el expediente administrativo que reduzca o menoscabe el valor probatorio de la evidencia tomada en cuenta por la agencia, hasta el punto que no sea posible concluir que su determinación fue razonable. Véase, *Mun. de San Juan v. Plaza Las Américas, supra; López v. Administración, supra; Hernández v. Centro Unido, supra; Comisionado de Seguros v. Puerto Rican Insurance Agency, supra; Martínez v. Rosado, supra; Polanco v. Cacique Motors, supra; Otero v. Toyota, supra; Rebollo Vda. de Liceaga v. Yiyi Motors, supra; Pacheco Torres v. Estancias de Yauco, supra.*

De otro lado, debemos deferencia al dictamen administrativo. Véase, *Mun. de San Juan v. Plaza Las Américas, supra; López v. Administración, supra; Hernández v. Centro Unido, supra; Comisionado de Seguros v. Puerto Rican Insurance Agency, supra; Martínez v. Rosado, supra; Polanco v. Cacique Motors, supra; Otero v. Toyota, supra; Rebollo Vda. de Liceaga v. Yiyi Motors, supra; Pacheco Torres v. Estancias de Yauco, supra.*

## V

Por los fundamentos antes expuestos, se confirma la resolución del Departamento de Asuntos del Consumidor, mediante la cual se desestimó la reclamación de los recurrentes.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones